332 N.E.2d 256 (1975)
GARY TEACHERS UNION, Local No. 4, American Federation of Teachers and William H. Tankersley, Individually and Jointly, Appellants,
v.
SCHOOL City of Gary, Indiana, et al., Appellees.
No. 3-973A126.
Court of Appeals of Indiana, Third District.
August 12, 1975.
Rehearing Denied September 15, 1975.
*257 Hilbert L. Bradley, Gary, for appellants.
*258 Thomas C. Granack, Smith & Garnack, Hammond, William J. Regan, Merrillville, for appellees.
GARRARD, Judge.
This action was commenced to contest the discharge of appellant Tankersley from his teaching position in the Gary school system and to secure construction of a provision in the collective bargaining agreement between the school and the appellant union.
The trial court determined that the contract provision was void as contrary to law and that the teacher had been properly discharged. We affirm.
We first consider the provision contained in the collective bargaining agreement.[1] It provides under Article X:
"A. Any teacher who shall serve under contract as a teacher in the School City of Gary for three (3) or more successive years and who shall at any time thereafter enter into a teachers contract for further service with the School City of Gary shall acquire Gary Tenure and shall have his contract renewed automatically without further formal evaluation.
B. Cancellation of such School City of Gary indefinite contract may be made only for such cause as prescribed under existing state statutes concerning dismissal of teachers who have acquired tenure as defined in Indiana statutes."
It is not disputed that at the time of his discharge, Tankersley had taught in the school system for three successive years and had entered into contract for the fourth year.
Tankersley and the union contend that Article X thus requires not only that his discharge must be predicated on one of the grounds enumerated in the Teacher Tenure Act (IC 1971, 20-6-12) but that the discharge can be effected only by strict adherence to the procedures prescribed for the discharge of tenure teachers.
The trial court did not reach the question of the proper interpretation of the second clause, but instead determined that the provision for "Gary tenure" was contrary to law and unenforceable.[2]
The Teacher Tenure Act provides that teachers who have served under contract as a teacher in a school city or school town corporation for five or more successive years and then enter into a contract for further service with such corporation shall thereupon become "permanent" teachers with indefinite contracts to remain in force until the teacher reaches 66 years of age. IC 1971, XX-X-XX-X. Teachers acquiring the status of permanent teacher may be terminated for only the causes and upon application of the procedures prescribed by the act. IC 1971, XX-X-XX-X.
It has been previously held that a teacher meeting these requirements becomes a permanent teacher subject to the act even though he and the school corporation attempted to contract for a definite term. School City of Lafayette v. Highley (1938), 213 Ind. 369, 12 N.E.2d 927.
The question here presented is the obverse of the situation in Highley. Assuming the teacher and school cannot avoid tenure status for a teacher meeting the statutory qualifications, can they agree to provide tenure to one who has not met the statutory requirements?
While the language of Article X refers merely to the grounds for discharge established under the Tenure Act, its purpose *259 and impact are much broader.[3] It purports to govern not only discharges during the period the teacher is teaching under his yearly contract, but also, "renewals" of his contract for the succeeding year. In other words, by imposing the requirement of cause for termination, it eliminates the simple device of nonrenewal at the end of the term as a means of replacing a teacher. Once this requirement of cause is imposed upon the relationship, constitutional due process requires notice and hearing. Board of Regents v. Roth (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Perry v. Sindermann (1972), 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570.
Thus, to determine whether such action is within the authority granted by the legislature, it is necessary to review both the nature of the Tenure Act and subsequent enactments dealing with teacher employment.
In Highley the Supreme Court declared the purpose of the Tenure Act to be:
"... to protect the educational interest of the state by the establishment of a uniform system of permanent contracts. It is not its purpose to foster the interests of or to create special privileges to any teacher or class of teachers. The policy of the law is to establish a uniform tenure system for all the schools of the state, and must be construed liberally with that aim and end in view." 213 Ind. 376, 377, 12 N.E.2d 930. (Our emphasis.)
Thus, the court concluded:
"A tenure teacher, serving under an indefinite contract, can become such teacher by one method only, and that is by teaching five years under contract, and by thereafter entering into another contract for further service with the same school corporation." 213 Ind. 377, 12 N.E.2d 930. (Our emphasis.)
In the present context, it is well to recall the further statement of the legislative justification for the act and the manner in which it is to be construed, as voiced by the court in Miller v. Barton School Twp. (1939), 215 Ind. 510, 20 N.E.2d 967, that the Tenure Act is based upon the public policy of protecting the educational interests of the state and it is therefore the duty of the court to adopt that construction of the act best calculated to protect the public right as against the individual right.
At this juncture there can be little doubt of the service to the public interest in education which the security of the tenure system provides in attracting and keeping capable teachers in the field.
There, however, appears to be equally little doubt that the public interest in capable teachers providing quality education also demands some reasonable period of time within which a school system may seek to improve the quality of its teachers, even though those replaced may meet minimal standards of competence and behavior. In the Tenure Act the legislature established that period as the first five years of consecutive service. That another or shorter period of time might also be reasonable, or even more desirable, is a matter for the legislature rather than this court.
In addition, a policy of uniformity appears meritorious not merely to deter devisiveness but because it creates an assurance to those entering and engaging in the teaching profession that these assurances will not be altered by the whim of the community if they find it necessary or desirable to move from one community to another.
*260 Having thus established the purpose of the act, it only remains to determine whether that purpose has been altered by subsequent legislation.
The only relevant statute we find is the General School Powers Act of 1965, IC 1971, 20-5-2. However, while that act refers to the general powers of a school corporation to employ, contract for and discharge teachers, such power is specifically qualified.
"The compensation, terms of employment and discharge of teachers shall, however, be subject to and governed by the laws relating to employment, contracting, compensation and discharge of teachers;... ." IC 1971, 20-5-2-2(7).
It is apparent from this provision that in enacting the school powers act, the legislature did not intend to alter the laws relating to the employment and discharge of teachers.[4]
We therefore hold that the Teacher Tenure Act controls and prohibits according tenure status to teachers before the statutory requirements are met.
We next consider whether the court correctly sustained the discharge of Tankersley under his individual contract.
That contract provides in part:
"It is agreed by the parties hereto that in case the said teacher should, after opportunity for hearing with benefit of legal counsel, be held by said employer to be guilty of incompetency, immorality, insubordination or other offence recognized as just cause according to law for cancellation of contract, such teacher, subject to proper appeal, shall be deemed to be dismissed ... subject, however, to the provisions of law concerning the employment and dismissal of teachers which are in force and effect."
Tankersley contends that his discharge was improper under this provision because he was not given adequate notice of the charges against him; he was not accorded his right to a prior hearing; he was improperly prejudiced by the introduction of inadmissible evidence before the school board, and, in any event, no proper cause for discharge was established.
The procedural facts disclose that Tankersley had been employed as a teacher for three successive years at the end of the 1971-1972 school year. In August 1971, a criminal affidavit charging Tankersley with theft, assault and battery and fleeing a police officer was filed in the City Court of West Lafayette, Indiana. In September, a representative of the school wrote Tankersley advising him that the school had been notified of his alleged involvement in the West Lafayette matter and unless he resigned, he would be suspended pending termination proceedings. Tankersley promptly replied asserting that he was not guilty of the charges and therefore could not resign.
He continued to teach and on February 14, 1972, the criminal charge of theft was dismissed and he entered pleas of guilty to the counts for assault and battery and fleeing a police officer.
On May 18, 1972, he was allegedly involved in a disturbance in the City of Hobart. He was arrested and charged with disorderly conduct, resisting arrest by flight and illegal possession of fireworks.
On June 9, the school sent him the following letter:
"The School City of Gary has received the results of your trial in West Lafayette, Indiana.

*261 I am recommending to the Board of School Trustees the termination of your employment, effective the end of the day, June 30, 1972.
Be advised that you have access to the grievance procedure concerning the decision."
(Article IV of the collective bargaining agreement defines a grievance as an alleged violation of the agreement, board and personnel policy or established working conditions or practices. The procedure to handle grievances is established in four stages. Stage 1 provides for informal adjustment with the principal. Stage 2 is a formal presentation with the superintendent. Stage 3 is an arbitration proceeding which is optional with the union. Stage 4 is a hearing with the school board. Where the grievance arises from action of authority other than a principal, the grievance may be initiated at Stage 2.)
On June 14, the union requested a second stage grievance meeting to discuss Tankersley's termination. That meeting was held June 28 and was attended by Tankersley and his attorney. The school denied the grievance and advised Tankersley by mail that he was being terminated as of June 30. (It is here relevant to note that Tankersley's 1971-72 contract expired in June and the contract for the 1972-73 year was for a term commencing September 25, 1972.)
On July 7, Tankersley's attorney wrote to the school board requesting a statement of formal charges and the opportunity for a hearing. The school promptly replied, setting a hearing for August 29 and advising that the West Lafayette incident of August 21, 1971 and "an unacceptable pattern of conduct" continued by the incident on May 18, 1972, occurring in Hobart, Indiana, at or about 220 North Ohio Street, constituted the charges.
For a reason not disclosed by the record, this hearing was not held until September 14. At that time Tankersley was present with counsel and was afforded the opportunity to confront and cross examine the witnesses against him, the opportunity to present evidence in his own behalf, and the privilege to refrain from testifying.
He was thereafter advised in writing that the school board, "after careful consideration of the oral testimony, cross examination, and documents submitted at the Board hearing" determined that the charges had been substantiated, that grounds for termination existed, and that he was therefore dismissed.
The notice to which Tankersley was entitled is that required by due process of law attendant to his contractual right to a hearing to establish cause. He was entitled to know the nature of the accusation so that he might intelligently prepare to meet it. However, in the absence of specific statute or other formal statement of procedure, no particular form or specific content is required. It is sufficient if the party is fairly apprised of the claim against him. Dohany v. Rogers (1930), 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904; Cf. Fuentes v. Shevin (1972), 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556.
Here the series of communications from the school culminating in the reply to the July 7 letter from Tankersley's attorney sufficiently advised Tankersley of the matters being urged against him. Indeed, counsel does not really contend he was insufficiently advised. The contention is, rather, that the matters charged should not constitute a basis for the action taken.
We recognize that due process requires that the hearing be had before the deprivation at issue takes place. Fuentes, supra; Bell v. Burson (1971), 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90.
Counsel contends that this requirement was not met either because the final notice of hearing and charges came after the Stage 2 grievance proceeding and therefore Tankersley did not receive prior notice; *262 or because the Stage 2 grievance meeting constituted a prior determination that rendered the September hearing a sham.
We recognize that the grievance procedure outlined in the collective bargaining agreement is mechanically somewhat at odds with the prior hearing procedures required under the individual contract or the teacher's tenure act.
Under the facts in this case we need not dwell upon the resolution of that conflict. The grievance procedure clearly preserves the teacher's right to proceed through the Stage 4 meeting with the school board. If it was error to hold a Step 2 grievance meeting, the error was invited by Tankersley's agent for collective bargaining by virtue of the grievance provisions and the request from the union for the Step 2 meeting, and Tankersley did attend with counsel and participate. At the commencement of the September hearing, Tankersley and the school board expressly agreed that the hearing to be held would constitute both the Stage 4 hearing and the hearing referred to in Tankersley's individual contract. Furthermore, the course of the grievance proceedings was conducted during a period of time before the contract was to go into effect. There is nothing in the record to intimate that the September hearing was other than a fair hearing on the merits of the charges. Accordingly, we cannot say that the trial court erred in determining that Tankersley was in fact afforded the hearing required by his contract and due process. Doran v. Board of Ed. (1972), Ind. App., 285 N.E.2d 825.
At the hearing, the police officers involved in the arrests in West Lafayette and Hobart appeared and testified regarding Tankersley's conduct on those occasions. This evidence was objected to on the basis that the conviction record was the best evidence regarding the West Lafayette incident, that the charges in Hobart had not been disposed of at the time of the hearing, and that the reference to the Hobart matter was so vague as to fail to satisfy the due process requirement of notice.
It must be remembered that proceedings for the discipline or discharge of individuals generally have a twofold purpose. First, it is the function of the hearing body to determine the truth or falsity of the alleged misconduct. Secondly, but of equal importance where the penalty to be imposed is discretionary, it is the function of the hearing body to determine the precise penalty to be imposed or whether the penalty sought to be imposed is warranted.
With regard to this second purpose, facts and circumstances surrounding the alleged misconduct are relevant to establish mitigation or aggravation attending the complained-of activity. Accordingly, it was relevant to the hearing to permit the eyewitness testimony of the officers involved.
Tankersley's other objection to the evidence concerned the introduction of the disposition record of the charges in West Lafayette. Counsel objected that the records were not properly authenticated since they were certified by the judge rather than the city clerk. The objection is not well taken. IC 1971, XX-X-XX-X provides that copies of the proceedings and judgments of any justice of the peace in Indiana shall be admissible when certified to by the justice. In Roberts v. State (1921), 190 Ind. 232, 130 N.E. 125, this was held to be the proper method of authenticating city court records.
Tankersley's principal contention on the discharge itself is that he was merely convicted of a misdemeanor, and at least without prior written policy to the effect that conviction of a misdemeanor was cause for discharge, sufficient cause was not established.
The contract specified as grounds for cancellation "incompetency, immorality, insubordination or other offense recognized *263 as just cause according to law for cancellation."
In construing the language of the tenure act which also refers to "other good and just cause", our Supreme Court in McQuaid v. State (1937), 211 Ind. 595, 6 N.E.2d 547, expressly held that other good and just cause was not limited by the enumerated grounds but instead permitted discharge in the absence of one of the other grounds so long as there was just and good cause and the discharge was not for political or personal reasons. See, also Stiver v. State (1937), 211 Ind. 370, 1 N.E.2d 592.
It cannot be said that a teacher's conduct outside the classroom bears no reasonable relation to his qualifications for employment. As observed by the United States Supreme Court in Adler v. Bd. of Education (1952), 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517:
"A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds toward the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty."
Here the school board heard the evidence of a West Lafayette police officer that he observed Tankersley go to a bicycle rack in front of an apartment house and attempt to cut the chain lock on a bicycle. When he was unable to do so, he went to another bicycle rack and returned with a girl's bicycle which he placed in a red VW bus. When the officer went up to the bus and identified himself as a police officer, Tankersley started the engine and "cut into" the police officer and then drove off. The officer called for assistance and Tankersley was subsequently apprehended. The officer from Hobart testified that he observed Tankersley and two others walking up to a house at 220 N. Ohio Street at about 12:45 a.m. When one of the persons then lit what appeared to be a fuse, the officer and his partner jumped out of their car, identified themselves as police officers, and told the three subjects to "hold it". When this happened, they "dropped what they had lit and took off running". The officers caught them when they jumped into a red VW bus and attempted to drive away.
Tankersley offered no denial or explanation of the conduct described in this testimony.
The trial court correctly determined that there was substantial evidence in support of the Board's determination.
Tankersley also urges that he has been denied equal protection of the law. The only support for this allegation urged in his brief is the bare assertion that other Gary schoolteachers have been charged with misdemeanors and have not been discharged from employment. That is insufficient to present the matter for appellate review. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7). Similarly, the remaining assignments in the motion to correct errors have been waived since they were not urged in the argument portion of appellant's brief.
The judgment is therefore affirmed.
HOFFMAN, J., concurs.
STATON, P.J., dissents with opinion.
STATON, Presiding Judge.
Tankersley's teaching contract was terminated. Later, he received a written statement of the charges against him which were the basis of his termination. Two and a half months later, he received a *264 hearing on the written charges. Before his termination, he had executed a teaching contract on April 25, 1972 for the school year beginning September 25, 1972. This contract was a general non-tenured contract, but under the collective bargaining contract which had been previously negotiated, Tankersley contended that he was entitled to tenure and the procedural safeguards provided by the Teacher Tenure Act. Tankersley was terminated on June 30, 1972 and received his hearing on September 14, 1972. The majority opinion concluded that the collective bargaining contract provision, Article X, was invalid since the "... Teacher Tenure Act controls and prohibits according tenure status to teachers before the statutory requirements are met."
I dissent from the majority opinion, and I would remand this cause to the trial court for these reasons:
1. The Teacher Tenure Act does not manifest a legislative intent to establish a uniform minimum trial period of employment for non-tenured teachers. The "trial period" rationale suggested by the majority is illusory and insubstantial when examined in light of the procedural and substantive rights which have recently been accorded to non-tenured teachers. The only substantial legislative policy underlying the Tenure Act is to provide limited job security after a uniform maximum period of teaching service. The Tenure Act should not be interpreted to bar a school corporation from contractually establishing more advantageous tenure arrangements which tend to further the Act's fundamental "job security" purpose.
2. Since the legislative policy underlying the Tenure Act is not offended by Article X of the collective bargaining agreement, the General School Powers Act authorizes the School City to contractually establish minimum procedural safeguards governing the dismissal of non-tenured teachers.
3. The majority fails to confront the issue of whether Tankersley's personal contract was breached.
4. I would remand this cause to the trial court for a construction of Article X of the collective bargaining agreement, and for a determination of whether the School City's failure to provide a formal evidentiary hearing prior to Tankersley's dismissal constituted a breach of Article X. I would also require the trial court to consider whether the School City's failure to afford Tankersley a hearing prior to his dismissal constituted a breach of his personal contract of employment.

I.

Contractual Tenure
The majority concludes that the legislative purpose underlying the Teacher Tenure Act is jeopardized by the procedural safeguards afforded to non-tenured teachers under Article X of the collective bargaining agreement. It is contended that the Tenure Act reflects a legislative judgment "... that the public interest ... demands some reasonable period of time within which a school system may seek to improve the quality of its teachers, even though those replaced may meet minimal standards of competence and behavior." While the Supreme Court's opinions in School City of Lafayette v. Highley (1938), 213 Ind. 369, 12 N.E.2d 927 and Miller v. Barton School Twp. (1939), 215 Ind. 510, 20 N.E.2d 967 do indicate that the state has an interest in establishing a uniform system of teacher tenure, neither Highley nor Miller articulate the nature and content of the state's interest in uniformity. I reject the majority's conclusion that the Tenure Act functions to promote educational quality by establishing a minimum *265 trial period during which heightened standards of professional competence may be applied in evaluating the performance of novice teachers. The job security afforded to a teacher who attains statutory tenured status offers no protection from a dismissal caused by that teacher's failure to perform at a higher level of teaching competence, even if the higher standard is imposed after the teacher has attained statutory tenure. The Tenure Act provides that a tenured teacher may be dismissed "... for incompetency, insubordination ..., neglect of duty, immorality, justifiable decrease in the number of teaching positions or other good and, just cause, but may not be [dismissed] for political or personal reasons; ..." IC 1971, XX-X-XX-X (Burns Code Ed.). The Indiana Supreme Court has consistently interpreted the Act's "good and just cause" provision to authorize a tenured teacher's dismissal upon "... any ground which is put forward in good faith, and which is not arbitrary, irrational, unreasonable, or irrelevant to the school board's task of building up and maintaining an efficient school system." Board of School Trustees v. Moore (1941), 218 Ind. 386, 393, 33 N.E.2d 114, 116; McQuaid v. State ex rel. Sigler (1937), 211 Ind. 595, 6 N.E.2d 547. Thus, there can be little doubt that a tenured teacher's failure to satisfy a standard of performance more demanding than the standard which existed during his first five years of teaching would constitute "good and just cause" for dismissal.
I also reject the majority's suggestion that the Tenure Act's minimum trial period provides school authorities with the unbridled discretion to dismiss non-tenured teachers for any reason which appeals to their whim or caprice. In Tilton v. Southwest School Corp. (1972), Ind. App., 281 N.E.2d 117, this Court held that a non-tenured teacher cannot be dismissed for a cause which has no rational relation to the school corporation's business or educational interests. Moreover, IC 1971, XX-X-XX-X (Burns Code Ed.) provides that a non-tenured teacher has the right to demand "... a written statement showing [the] reason for such dismissal."
I agree with the majority's observation that "... there can be little doubt of the service to the public interest in education which the security of the tenure system provides in attracting and keeping capable teachers... ." The Tenure Act's purpose of promoting job security is not impaired by Article X of the collective bargaining agreement. To the extent that Article X embodies the procedural protections extended by the Tenure Act, it promotes the retention of qualified teaching personnel. Since the legislative policy underlying the Tenure Act is not offended by Article X of the collective bargaining agreement, the General School Powers Act clearly authorizes the School City to contractually establish minimum procedural safeguards governing the dismissal of non-tenured teachers.
The General School Powers Act expressly confers broad authority on local school corporations to establish the terms and conditions of employment applicable to all school personnel. IC 1971, 20-5-2-2 (Burns Code Ed.), which enumerates the specific powers of school corporations, provides in part:
"In carrying out the school purposes of each school corporation, its governing body acting on its behalf shall have the following specific powers:
......
(7) To employ, contract for and discharge superintendents, supervisors, principals, teachers, .. .; to fix and pay the salaries and compensation of such persons and such services; to classify such persons or services and to adopt schedules of salaries or compensation; to determine the number of such persons or the amount of services thus employed or contracted for; and to determine the nature and extent of their duties.

*266 The compensation, terms of employment and discharge of teachers shall, however, be subject to and governed by the laws relating to employment, contracting, compensation and discharge of teachers;..."
IC 1971, 20-5-1-3 (Burns Code Ed.), the general definitional section of the Act, expressly defines "[l]aws relating to the employment, contracting, compensation and discharge of teachers" to encompass the provisions of the Indiana Teacher's Tenure Act. In addition, certain provisions of the General School Powers Act provide interpretative guidance. IC 1971, 20-5-2-2, supra, the "specific powers" section of the Act, includes an implied powers provision which states:
"(19) To exercise any other power and make any expenditure in carrying out its general powers and purposes provided in sec. 201 [20-5-2-1] or in carrying out the powers delineated in this sec. 202 which is reasonable from a business or educational standpoint in carrying out school purposes of the school corporation, including but not limited to the acquisition of property or the employment or contracting for services, even though such power or expenditure shall not be specifically set out herein; and the specific powers set out in this section shall not be construed to limit the general grant of powers provided in sec. 201 [20-5-2-1] except where a limitation is set out in this act by specific language or by reference to other law."
Finally, IC 1971, 20-5-6-3 (Burns Code Ed.), establishes a general tenet of construction:
"This act [20-5-1-1 - 20-5-6-7] shall be liberally construed to permit the governing body of school corporations to conduct its affairs in a manner consistent with sound business practice to the ends that the authority of the governing body shall be clarified and that it shall be permitted to operate with the maximum efficiency consistent with accountability."
The central unifying principle of the General School Powers Act is that local school corporations, while wholly legislative creatures, are statutorily invested with broad managerial autonomy to formulate and implement educational polices tailored to the needs of their respective communities. In Salem Community School Corp. v. Easterly, (1971), Ind. App., 275 N.E.2d 317, 322, this court recognized that the Act manifests a legislative intent to accord substantial implied authority to locally elected school officials:
"The General School Powers Act is the broad grant of authority to the public school authorities in the State of Indiana `to prepare, make, and enforce . ..' (our emphasis) rules and regulations pertaining to the operation of the public schools in the State of Indiana... ."
Thus, the trial court and majority's conclusion that a specific enabling provision would be required to empower school corporations to contract for any terms of employment differing from those provided by the Tenure statute is at odds with the legislative policy underlying the Act. In Gary Teachers Union, Local No. 4, AFT v. School City of Gary (1972), Ind. App., 284 N.E.2d 108, this court held that the General School Powers Act provided local school corporations with the implied authority to bargain collectively with teacher representatives. Moreover, it has been held that the Act provides school corporations with sufficient authority to contract for compulsory arbitration of disputes arising under collective bargaining agreements. East Chicago Teachers Union, Local No. 511, AFT v. Board of Trustees (1972), Ind. App., 287 N.E.2d 891. The interpretive approach adopted in these cases supports and demands a construction of the Act which invests Indiana's school corporations with all implied authority "... reasonable from a business or educational standpoint... ." IC 1971, 20-5-2-2, supra.
*267 The General School Powers Act does, however, impose some limits on a school corporation's implied power to either unilaterally or contractually establish the terms and conditions of employment for its personnel. While sub-section 7 of IC 1971, 20-5-2-2, supra, confers broad authority "[t]o employ, contract for and discharge... ." school personnel, sub-section 7 also provides that "[t]he compensation, terms of employment and discharge of teachers shall, however, be subject to and governed by the laws relating to employment, contracting, compensation and discharge of teachers; ..." In Weest v. Board of School Comm'rs of City of Indianapolis (1974), Ind. App., 320 N.E.2d 748, this proviso to sub-section 7 was construed as a limitation on the authority of a school corporation "to enter into any agreement which operates in derogation of the laws governing compensation of teachers." (Our emphasis), Id. at 752. Although the Weest court determined that the plaintiff-teacher had not been deprived of her statutory right to accumulated sick pay by the collective bargaining agreement under consideration, Judge Lybrook construed the proviso to sub-section 7 as a general limitation of the authority of a school corporation to adopt teacher employment terms which are less advantageous than those provided by statute. The state has a legitimate interest in prescribing certain minimum terms of employment in order to assure that qualified personnel will be attracted to serve in Indiana's primary and secondary schools. The proviso to sub-section 7 cannot be construed to impinge on the broad authority of local school corporations to adopt terms of employment which are more advantageous to school personnel than those provided by statute.
The only limitation imposed by the General School Powers Act is that the more advantageous terms of employment adopted be "... reasonable from a business or educational standpoint... ." IC 1971, 20-5-2-2, supra. In order for this court to determine whether the "Gary tenure" plan under consideration is rationally related to some legitimate "business or educational" purpose, the distinction between statutory tenure and non-tenure status must be examined.

II.

Tenure Status
Tankersley and the Union contend that Article X of the collective bargaining agreement provides all the rights and benefits of statutory tenure to qualified teachers in the Gary school system. Assuming arguendo that this is an accurate construction of Article X, a careful examination of the Indiana Teacher's Tenure Act discloses that the sole advantage of statutory tenure status is the right to a hearing prior to dismissal with certain attendant procedural safeguards. IC 1971, XX-X-XX-X (Burns Code Ed.). While the Act also provides that a tenure teacher's dismissal must be predicated on some "good or just cause," this court has held that a non-tenure teacher cannot be dismissed in the absence of some reason that is rationally related to a school corporation's educational and business concerns. Tilton v. Southwest School Corp., supra. Thus, Article X of the collective bargaining agreement, assuming that it does incorporate the benefits of statutory tenure, merely provides certain formal hearing rights not otherwise available to teachers who have not satisfied the six year prerequisite of the Indiana Teacher's Tenure Act.
There is no evidence of a legislative intent, either in the Indiana Teacher's Tenure Act or the General School Powers Act, to limit the implied authority of a school corporation to contractually extend the hearing rights afforded statutorily tenured teachers to other teaching personnel. The general limitation on the implied authority of school corporations requiring that the action be "... reasonable from a business or educational standpoint . .," *268 is not offended. The trial court and majority's holding that the School City of Gary lacked the statutory authority to contractually implement the "Gary tenure" plan is erroneous.

III.

Breach of Personal Contract
Tankersley and the Union consistently asserted that the School City's failure to provide a formal evidentiary hearing prior to the effective date of Tankersley's dismissal constituted a breach of Tankersley's personal contract of employment. Tankersley's individual contract contained the following provision concerning dismissal:
"It is agreed by the parties hereto that in case the said teacher should, after opportunity for hearing with benefit of legal counsel, be held by said employer to be guilty of incompetency, immorality, insubordination or other offense recognized as just cause according to law for cancellation of contract, such teacher, subject to proper appeal, shall be deemed to be dismissed and shall thereafter hold no claim for further compensation, subject, however, to the provisions of law concerning the employment and dismissal of teachers which are in force and effect. Revocation of license by the State Department of Education for any statutory reason shall be deemed to constitute incompetency under this contract." (Emphasis added).
In response to this assertion of contractual breach, the School City contended that the four-stage grievance procedure established by the collective bargaining agreement was intended to supplant any procedural rights provided by Tankersley's individual contract. The School City also argued, in the alternative, that if the individual contract were construed to require a hearing prior to dismissal, the informal second-stage meeting provided by the grievance procedure should be deemed sufficient to satisfy a "prior hearing" requirement.
The trial court's judgment and decree wholly failed to discuss whether Tankersley's individual contract provided any right to a formal hearing prior to his termination. The majority opinion expressly recognizes "... that the grievance procedure outlined in the collective bargaining agreement is mechanically somewhat at odds with the prior hearing procedures required under the individual contract ...," but concludes that there was no violation of Tankersley's contractual right to a prior hearing. The majority's avoidance of this difficult question of contract construction would appear to be premised on three distinct grounds: (1) the collective bargaining agreement's grievance procedure provided Tankersley with the right to a formal evidentiary hearing before the school board; (2) Tankersley and the school board agreed that the fourth stage hearing constituted the "hearing" required by Tankersley's individual contract; and (3) the formal hearing on September 14, 1972 "... was conducted during a period of time before the contract [Tankersley's 1972-73 contract] was to go into effect." None of these grounds furnish any adequate justification for the majority's failure to resolve the clear procedural conflict between the School City's reliance on the grievance procedure and Tankersley's claim that his contractual right to a "prior hearing" was abridged.
While it is true that "The grievance procedure clearly preserves the teacher's right to proceed through the Stage 4 meeting with the school board.", the grievance procedure contains no provision governing when the School City's unilateral right to terminate a teacher's contract accrues. The majority's ambiguous rationalization overlooks the real dispute between the parties  what is the content of Tankersley's contractual right to a "prior hearing" in the context of the collective bargaining agreement's grievance procedure? If the majority's reticence to grapple with this fundamental issue is due to the inadequacy of *269 the trial record, it should remand the cause for a clear construction of these conflicting contract provisions.
The majority underscores the stipulation that "... Tankersley and the school board expressly agreed that the hearing to be held would constitute both the Stage 4 hearing and the hearing referred to in Tankersley's individual contract." This statement suggests that the parties' informal stipulation constitutes an express waiver of Tankersley's contractual right to a hearing prior to his dismissal. The majority's inference of waiver is negated by the record. It is undisputed that Tankersley's contract was formally terminated almost two and one-half months prior to the school board hearing. At both the hearing and the trial, Tankersley contended that the School City's failure to provide a hearing prior to dismissal constituted a breach of his individual contract. Under Tankersley's theory, a clear breach of his contract had already occurred at the time when the school board hearing was convened. It should also be noted that the School City's characterization of the fourth stage hearing as "... the hearing referred to in Tankersley's individual contract" is inconsistent with the construction of the individual contract it advanced at trial. At trial, the School City contended that the "prior hearing" referred to in Tankersley's individual contract contemplated an informal second-stage meeting under the grievance procedure.
As a third ground in support of its conclusion, the majority asserts that the hearing before the school board "... was conducted during a period of time before the contract was to go into effect." This assertion is not supported by the record. Tankersley's personal contract for the 1972-73 academic year was executed on April 25, 1972. While the agreement does state that the parties' respective duties of performance would not arise until the commencement of the academic year on September 25, 1972, it contains no provision which postpones its effective date until September 25, 1972. In the absence of some contrary expression of intent, it is a well-established principle of contract formation that an agreement is legally effective on the date of its execution. See, e.g., Cal Hirsch & Sons Iron & Rail Co. v. Peru Steel Casting Co. (1911), 50 Ind. App. 59, 96 N.E. 807; Haskell & Barker Car Co. v. Allegheny Forging Co. (1910), 47 Ind. App. 392, 91 N.E. 975. Since the contract was clearly in effect when the School City's alleged breach occurred, I fail to appreciate the relevance of the majority's assertion that the contract was merely executory at the time of Tankersley's dismissal.
I would remand this cause to the trial court for further proceeding consistent with this dissenting opinion and as more specifically outlined in reason "4" above.
NOTES
[1] The agreement is not a product of the collective bargaining act of 1973, IC 1971, 20-7.5-1. Its authorization arises under Gary Teachers Union v. School City of Gary (1972), Ind. App., 284 N.E.2d 108.
[2] Article XXIX of the agreement contains a savings clause providing for non-enforcement of any provision determined to be contrary to law.
[3] If the provision dealt merely with grounds in practice, it would be superfluous except to establish a separate violation of the bargaining agreement since the uniform terms of a teacher's individual contract specify the same grounds in nearly identical language to the Tenure Act.
[4] While the collective bargaining act of 1973, IC 1971, 20-7.5-1, is not applicable to these proceedings, it too manifests this legislative intent by excluding employment and discharge from subjects for bargaining and providing instead that school employers shall have the responsibility and authority to hire and retain and to suspend and discharge employees in accordance with applicable law. IC 1971, 20-7.5-1-6(b).