TIPPECANOE VALLEY SCHOOL CORPORATION *v.* LEACHMAN

[No. 369A55. Filed September 8, 1970. Rehearing denied October 2, 1970. Transfer denied December 29, 1970.]

*Frederick E. Rakestraw, Chipman, Chipman & Rakestraw,* of Plymouth, for appellant.

*Thomas R. Lemon, Graham, Rasor & Harris,* of counsel, of Warsaw, *Lloyd C. Wampler,* of Plymouth, for appellee.

WHITE, J.—This is an appeal by the Tippecanoe Valley School Corporation (school corporation), defendant-appellant, from a judgment that James Leachman (teacher), plaintiff-appellee, a former teacher at defendant's Akron High School, have and recover from the school corporation $3,240.92, as damages for breaching the teacher's 1963-64 teaching contract.

The judgment was the result of a court trial. The facts were not found specially but the evidence most favorable to the teacher, supports the following account of the events which culminated in the judgment in his favor.

On June 19, 1963, the teacher and the school corporation executed a teacher's contract on a printed form prescribed by the State Superintendent of Public Instruction. By this contract plaintiff was employed to teach during the 1963-64 school year "in the Public Schools of said School Corporation in such places, grades, and subjects as shall be designated by such employer subject to reasonable conditions of employment" at a total annual compensation of $4,700.00. Words

written into blank columns on the form indicated the teacher was licensed to teach English and Social Studies. By a printed clause the teacher agreed "to use such text materials as are prescribed by said employer, and to observe all reasonable rules and regulations of the properly constituted school authorities. . . ."

The contract also contained this printed clause:

"It is agreed by the parties hereto that in case the said teacher should, after opportunity for hearing with benefit of legal counsel, be held by said employer to be guilty of incompetency, immorality, insubordination or other offense recognized as just cause according to law for cancellation of contract, such teacher, subject to proper appeal, shall be deemed to be dismissed and shall thereafter hold no claim for further compensation, subject, however, to the provisions of law concerning the employment and dismissal of teachers which are in force and effect. Revocation of license by the State Department of Education for any statutory reason shall be deemed to constitute incompentency under this contract."

Under date of July 11, 1963, the teacher wrote a letter to Mr. Rex McHatton, Principal of the Akron High School, stating that he was "to teach English and Social Studies at your high school for the coming year." He expressed the opinion that his abilities and the students' best interests would be served by his "teaching just literature and social studies." He pointed out the meager training in grammar he had received in completing his "minor" requirements in English and that he felt "very incompetent in teaching anything in the English field other than speech or literature". His "major" was social studies and he "could teach any course in this field", but he could do better with high school students (rather than those of junior high) and could do better with sociology and government.

On August 27, Mr. McHatton assigned him to teach only social studies: Two classes of United States history (eleventh grade) and two classes of United States government (twelfth

grade). He taught these courses from the opening of school until about November 11, 1963, when Mr. McHatton, his principal, telephoned him at his residence and reassigned him to teach ninth and tenth grade English.

Prior to the reassignment he had handed out to his history and government students lists of books from which they were required to read one. Some of these books, such as "Darkness at Noon" (apparently a novel) and "Winston Churchill" (apparently a biography of the United Kingdom's W.W. II Prime Minister) did not relate directly to either the geographical area or the historical period covered by any of the official course text books. He also read supplementary materials to his classes. Sometimes he "duplicated" passages from books, passed them out to the students, and required them to read them the night before for class discussion. He did not seek approval for use of the book list or the "duplicated" material. He did not know that approval was required until about November 19 or 20. He gave the principal a list of paperback books which he asked be made available for sale in the school office. This was not the list he gave to the students and no one ever asked him for that list. It was not until after he had been reassigned that Mr. McHatton told him that books had to be approved by him. Most books on the list given the students were available in the Warsaw book store and others were in his personal library, a part of which he had brought to school for his personal use. Until his conversation with Mr. McHatton about November 19 or 20 he knew of no objection to his teaching "or any comment one way or the other."

Under date of November 15, he wrote this note to defendant's superintendent of schools:

"Mr. Forbes:

I am asking that Mr. McHatton give this note to you since you have refused to talk with [sic] about this matter of my transfer of classes.

Because I am not qualified to teach English, I feel that I must *consider seriously* resigning from this position."

About November 22, 1963, he received his "dismissal" which was a "Memo" from Mr. Forbes, defendant's superintendent of schools, stating that defendant's school board "has voted unanimously to cancel your present contract on the basis of charges of insubordination and willful disobedience . . . to become effective immediately." He did not teach or report for work at any time thereafter.

About December 9, 1963, while he was still living in the vicinity (at North Manchester) he received a letter from the school corporation (by Mr. Forbes, Superintendent) stating that his contract cancellation had been rescinded, he had been reinstated retroactive to November 22, 1963, and he should report to Mr. Forbes for assignment.

Plaintiff did not report in person to Mr. Forbes for assignment, but did telephone his office and talk to his secretary. The content of that conversation is not in evidence.

One or two days later he received another letter from Supt. Forbes (for the school corporation) notifying him of a hearing to be held before the school board on December 18, 1963, at 9:00 P.M., to consider the matter of terminating his contract on charges of "incompetency and insubordination". It also stated: "If you desire to be heard concerning said charges you should attend the hearing at which time you may be heard by yourself or by counsel."

Four days after writing that letter, Superintendent Forbes wrote to the teacher's draft board in Terre Haute, as follows:

"Gentlemen:

James Leachman has not taught in our school since November 20, 1963. We have hired a replacement for him. To relieve ourselves of any further financial responsibility, it has been necessary to write a letter of reinstatement, followed by a statement of charges. We will be completely relieved of any responsibility on December 18, 1963. I write this letter inasmuch as I have understood that he is

using this reinstatement letter as proof that he is engaged in teaching. Actually he has not even reported to me for assignment as called for in the last paragraph. Whether he has quit or whether he has resigned, or whether he is relieved of assignments and dismissed may be debated, but I assure you he is not teaching in our corporation and he will not be teaching here."

At about the same time the teacher's attorney, Mr. Henderson, wrote to Superintendent Forbes, making six demands "in order to protect the interests of our client". Those demands are summarized as follows:

That the teacher be given:

1. A list of the specific charges.
2. Five days preparation time after receipt of the list.
3. The right to present witnesses.
4. The right to cross-examine adverse witnesses.
5. The right to employ at his own expense his own reporter.
6. A public hearing.

Although a reply "advising us of your intentions" was requested, no reply was ever made. Nevertheless, when the board met on December 18, 1963, at 9:00 P.M., Mr. Leachman was there with his attorneys, Mr. Henderson and Mr. Logue, accompanied by the official reporter of the Kosciusko Circuit Court. The reporter took verbatim notes from which she later typed a transcript which was introduced by the teacher as evidence at the trial.

The transcript, together with the superintendent's letter to the teacher's draft board and the first (the "rescinded") cancellation of the teacher's contract, provide evidence sufficient to sustain the teacher's contentions concerning the "hearing" and dismissal. The contentions are: that he was denied a list of the formal charges placed against him; that the decision was predetermined; that he was denied the right of cross-examination; that after learning the charges from the testimony he was not given an opportunity to prepare

a defense; and that he was denied the right to call witnesses. The evidence consisted of the testimony (mostly narrative in form) of the high school principal, the school corporation's assistant superintendent, and the school corporation's superintendent. The superintendent conducted the hearing as advocate for the school corporation and made a closing argument. The efforts of the teacher's attorney to act as the teacher's advocate were rebuffed by the superintendent and the school board president who presided. In the main, the testimony was a recitation of the witnesses' experience with the teacher. The evidence was sufficient to sustain the board's implied finding that the teacher was guilty of incompetence and insubordination.

We quote appellant's summary of the transcript for what happened after Superintendent Forbes and the other witnesses had concluded their recitals and argument:

"President Bucher then called on Mr. Henderson [the teacher's attorney]. Mr. Henderson asked for some time to talk the matter over, and was given five minutes. Mr. Henderson then proceeded to make a statement to the Board. He stated that he respected Mr. McHatton and Mr. Forbes' experience, and recognized the right of the Board to conduct the hearing. He objected that they had not been permitted to cross-examine anyone, and stated that they were not told in detail what the charges would be in advance. He asked to call Mr. Meredith and Mr. Forbes as his witnesses. Mr. Forbes and Mr. Meredith declined to testify. Mr. Henderson finally stated that it would serve no purpose to go any further. He indicated that they would present the matter somewhere else. There were some remarks between President Bucher and Mr. Henderson.

"Mr. Forbes [the superintendent] then made a summary to the Board of the statements given by the various witnesses. He recommended that Mr. Leachman be dismissed. Mr. Creighton moved that Mr. Leachman be dismissed, Mr. Davis seconded, and all Board members voted for dismissal. Mr. Henderson then asked about his pay, and it was indicated that he would be paid for the days that he taught. The meeting then terminated."

There is no evidence that any further action was taken or notice given to the teacher after the school board hearing and the vote for dismissal in his presence. The teacher, however, did write Mr. Forbes a letter from Terre Haute dated December 28, 1963, the body of which read:

> "Would you *PLEASE* send me the $341 of my back pay which you told my lawyer, Mr. Henderson, that you would get to me before Christmas. Because you did not send me that money, I could not buy any of my family any Christmas presents. I, too, must eat."

The $341.00 was then paid to him. He did no further work of any kind for the school corporation and made no offer to do any.

The plaintiff requested no administrative or judicial review of the school board hearing, (unless this lawsuit amounts to such a review). His complaint in this action alleged the contract, his teaching until November 22, 1963, his dismissal, his willingness to perform, and that $2,950.63 and interest remains unpaid. By a seven paragraph answer the school corporation-defendant-appellant pleaded: (1) admission and denial under Rule 1-3; (2) that failure to report for assignment after reinstatement constituted resignation; (3) failure to return to work after reinstatement; (4) failure to appeal after hearing and dismissal; (5) that plaintiff was incompetent to teach; (6) that plaintiff was insubordinate; and, (7) that plaintiff earned wages at other employments which should be considered in fixing damages in event of recovery.

The finding and judgment of the court was that the discharged teacher should recover from the school corporation $2,578.63, principal, plus $662.29 interest, a total of $3,240.92.

On this appeal the school corporation-appellant urges two points in support of its contention that the trial court's decision is not supported by sufficient evidence and is contrary to law.

First, the school corporation asserts that the teacher is

not entitled to recover on his contract because he has not proved that he has complied with all the provisions of the contract. The corporation does not contend there was any failure of proof that the teacher was present and taught the classes assigned to him every school day from the opening of school until he was discharged, nor does appellant contend that the compensation paid to the teacher for that performance prior to dismissal is in anyway involved in this lawsuit. Appellant's argument seems to relate to an assumed failure of the evidence to show that the manner in which the appellee taught his classes was a competent and subordinate performance of his duties.

The recovery in this case was in the amount of the teacher's salary for the remainder of the school year, the period during which he was not permitted to teach. If the school corporation's argument is intended to mean that the teacher's testimony that he was ready, willing and *able* to teach the remainder of the contract year must be buttressed by proof of his ability and submissiveness during the time he was permitted to teach, it must fail. Such a rule would nullify the "hearing provision" of the contract. A teacher dismissed, without a hearing, for alleged incompetence and insubordination, would be required to prove his competence and subordination. Yet by the terms of the contract he has a right to teach and to be paid for one school year, or until and unless, he is properly charged with some "good cause" for cancellation of his contract and that good cause is proven at a hearing at which he has the right to the benefit of counsel.

The appellant-school corporation's second point is that the school board's determination to cancel the appellee teacher's contract is conclusive; that the present action is a forbidden collateral attack on that administrative adjudication, which is subject to judicial review only by some approved method. It is contended that the Administrative Adjudication and Court Review Acts, Acts 1947, Ch. 365, Burns IND. STAT.

ANN. §§ 63-3001 through 63-3030, provides for judicial review of administrative decisions by the governing boards of school corporations because such bodies have been held to be state agencies. In the broadest sense, and in some contexts, school corporations and school boards are state agencies. We find no recorded case, however, in which the administrative adjudication act has been held applicable to any administrative body of less than statewide jurisdiction. The Act's definition of "agency" is not entirely free of ambiguity but certainly appears to use "state of Indiana" to mean "the government of the state of Indiana" which, in its narrowest sense, and most common usage is understood to mean statewide government and not local government.[1] All of the agencies expressly excluded from the act are agencies of statewide government.[2] Had the act's drafters intended the act to apply to local agencies they would certainly have found a need to expressly exclude some local agencies. Appellee points to the case of *State ex rel. Thurston* v. *School City of Anderson* (1957), 236 Ind. 649, 655, 142 N. E. 2d 914, an action to mandate the reinstatement of a tenure teacher discharged illegally in that statutory procedures were not followed. The court there held that "[t]he school city still has the right to proceed again by following the clear provisions of § 28-4308, Burns' 1948 Replacement." The cited statute (§ 28-4308) is a part of the Teachers Tenure Act (Acts 1927, Ch. 97, as amended) and provides a hearing procedure for cancelling the indefinite contracts of permanent teachers for cause.[3] As appellee points out, if the administrative adjudication act, enacted in 1947, were applicable to school corporations, its hearing procedure provisions would have supplanted the provisions of the 1927 Teachers Tenure Act.

We hold that the Administrative Adjudication and Court

---

1. Burns § 63-3002.
2. See Burns § 63-3002.
3. The teacher at bar was not a permanent teacher and his right to hearing is conceded to be only contractual.

Review Act of 1947 is applicable *only* to agencies of statewide government (and only to those agencies not expressly excluded by section 2 thereof).

Appellant-school corporation suggests that if there is no statutory provision for judicial review of the school board action in cancelling the teacher's contract, that the teacher must nevertheless first obtain a judicial review by one of the methods available before the act was passed. 1 West's I.L.E. 191, *Administrative Law and Procedure,* § 62. Appellant says that "[a]mong the methods which could have been used to obtain a court review were a petition for Writ of Certiorari; an action of mandate; an action for an injunction, or an action to set aside the act of the Board." The implication is that these methods of judicial review are direct attacks on the administrative action reviewed while the case at bar is an indirect or collateral attack. We have not been furnished, nor are we able to find, any satisfactory test for distinguishing between direct and collateral attacks. It is only when a statutory review procedure has been provided that the test is simple. In that case any court attack other than that provided for by the statute is a collateral attack. See 2 Am. Jur. 2d 301, *Adm. Law* § 494; *Public Service Commission* v. *City of Indianapolis* (1956), 235 Ind. 70, 83, 131 N. E. 2d 308.

*Keener School Township* v. *Eudaly* (1931), 93 Ind. App. 627, 635, 175 N. E. 363, was an " . . . action . . . brought by appellee against appellants to set aside the order of dismissal of appellee by appellant Hart, trustee of Keener Township, and appellant Sterrett, county superintendent of schools of Jasper County, Indiana, and to recover a money judgment for services as teacher against Keener Township. . . ." A money judgment against the township was affirmed. The county superintendent had heard, pursuant to what is now Burns § 28-2405 (1948 Repl.), an appeal from the township trustee's dismissal of appellee, which he affirmed. The statute makes the superintendent's decision final. The complaint's allegation

that the officers "acted in bad faith and fraudulently" was held sufficient to render it good against demurrer. It is not clear whether the sufficiency of the evidence was questioned but the court speaks of "evidence . . . tending to question the good faith and fairness of the county superintendent and township trustee who were the dismissing officers." The court quoted with approval *Christmann* v. *Coleman* (1927), 117 Ohio St. 1, 157 N. E. 482, 484, as follows:

> " 'The general rule is that, where power has been conferred upon an administrative officer or board to remove another officer, a teacher, or appointee, for cause, and the procedure is provided for such removal, *and the procedure has been followed,* the finding of such administrative officer or board dismissing another officer, a teacher, or appointee, is final and conclusive and not reviewable by the courts, either in a direct proceeding to reverse or by collateral attack, *except where such administrative officer or board has acted in bad faith, corruptly, fraudulently, or has grossly abused its discretion.' "  (First emphasis added here. Second added in *Keener.*)

In *School City of Crawfordsville* v. *Montgomery* (1933), 99 Ind. App. 526, 529, 187 N. E. 57, 59, we repeated the quotation and added:

> "We recognize that as a general rule of law. See *Kegerreis, Trustee* v. *State ex rel.* (1925), 195 Ind. 589, 146 N. E. 390. It applies where the power to remove an appointee is agreed to by contract, with the appointee, as in the instant case, as well as where such power is conferred by statute, as in the case of *Christmann* v. *Coleman, supra.*"

*Christmann* v. *Coleman, supra,* also quoted with approval a headnote from the official report of *McCrea* v. *Pine Township School District,* (1891), 145 Pa. 550, 22 A. 1040, as follows:

> " 'In an action by a teacher for salary, dismissal of the plaintiff for incompetency, if regularly made and properly entered upon the minutes, in accordance with the requirements of section 4, Act of April 11, 1862, P.L. 472, is con-

·˜clusive, unless the board be shown to have acted corruptly, or in bad faith, or to have clearly abused its powers.'"

In *School City of Crawfordsville, supra,* which was a breach of contract action, the complaint was held bad for failure to allege "bad faith, corruption, fraud or gross abuse of discretion on the part of the board." In that case neither the statute nor the contract required a hearing, the pertinent contract provision reading: "This contract may be terminated: (a) by the Board of Trustees at any time for good cause, if and when such Board acting in good faith and upon sufficient evidence shall find such good cause to exist." We there held that "[f]ailure to file charges and have a hearing, of itself, did not constitute fraud or bad faith." Here, however, the contract itself expressly gives the teacher the right to "opportunity for hearing with benefit of legal counsel".

The question of the sufficiency of plaintiff's complaint to state a cause of action is not before us for determination. The evidence, however, is sufficient to sustain an implied finding by the trial court that the procedure provided by the contract for the removal of the plaintiff from his position as teacher was not followed and that failure to follow it was a gross abuse of discretion.

Whether the cases we have cited and quoted are to be interpreted as approving a breach of contract action as an appropriate judicial review procedure for the limited purpose of determining whether the removal procedure has been followed and whether the removal was in bad faith, corrupt, fraudulent, or a gross abuse of discretion; or, whether those authorities approve a collateral attack when any of those infirmities are shown, is immaterial. Whether the trial in the court below was a collateral attack or a limited judicial review, it can easily be sustained as either or both. In proving conditions authorizing a collateral attack, the plaintiff submitted to the trial court all the evidence necessary to enable the court to review the school board's action to de-

termine whether it was a good defense to the teacher's demand for the unpaid balance of his year's salary. That evidence was sufficient to sustain the implied finding that the school board's action was a breach of the contract—a denial of the teacher's right to an "opportunity for hearing with benefit of counsel."

This is not shown to be a case in which a judge had usurped the functions, powers and prerogatives of an administrative officer or body by deciding that a judgment they had the power and the right to make was not the best judgment.[4] We cannot assume that the trial court found for the teacher because the judge believed the teacher was not incompetent and not insubordinate. We must assume that the court found that the school board had no right to adjudge the teacher incompetent and insubordinate because it had so far departed from the provided procedure that its action amounted to a gross abuse of discretion.

The case was fully and fairly tried and a just result reached. The judgment is

Affirmed.

Hoffman, P.J., Pfaff and Sharp, JJ., concur.

NOTE.—Reported in 261 N. E. 2d 880.

---

4. "It is not my purpose to place my judgment in the place of officers who are clothed with power to act and who have acted within the scope of their authority and to review their acts and say that under the circumstances I would have acted differently. I am only going into these questions far enough to enable me to say whether or not in my opinion they were acting in good faith. . . ." A part of trial judge's statement in *Keener School Twp.* v. *Eudaly, supra,* approved as a correct "theory." (93 Ind. App. at 638.)