**STATE of Indiana on the Relation of Earl NEWTON, Jr., Plaintiff-Appellant,**

v.

**BOARD OF SCHOOL TRUSTEES OF the METROPOLITAN SCHOOL DISTRICT OF WABASH COUNTY, Defendant-Appellee.**

No. 4–882A248.

Court of Appeals of Indiana, Third District.

March 7, 1984.

Richard J. Darko, Thomas M. Hinshaw, Bayh, Tabbert & Capehart, Indianapolis, Richard K. Helm, Rockhill Kennedy Pinnick Bent & Pequignot, Warsaw, for plaintiff-appellant.

Charles R. Tiede, Plummer, Tiede, Magley, Metz & Downs, Wabash, for defendant-appellee.

GARRARD, Judge.

In 1975 Earl Newton, Jr. was a sixth grade teacher at La Fontaine Elementary School in Wabash County. Newton began teaching for the Wabash County school system in 1963. In 1968 he received tenure. In mid-April of 1975 Newton received a letter from Laurence Wade, who was then the superintendent of the metropolitan school district of Wabash County. The letter informed Newton that Wade had determined "upon recommendation of staff, to recommend to the Board of Education the cancellation of your contract as a teacher

... effective on May 29, 1975 at the close of the school day."

Newton responded with a letter to Richard Early. Early was at that time the president of the board of education of the Wabash County school district (hereinafter, "School Board"). Newton's letter requested that he be "given in writing the reasons ... for dismissal." Newton asked that the reasons be specific and be described in detail sufficient to permit a "fair appraisal" and rebuttal. Newton also indicated he desired a hearing at which he might present evidence on his behalf and challenge the allegations serving as the predicate for dismissal. On May 2, 1975 Wade wrote Newton that his contract was being cancelled for "insubordination, neglect of duty [and] undermining public confidence in the normal education process by refusing to follow established procedures." Wade advised Newton that a hearing on his dismissal would be held, and commented that "[c]opies of any item in your file will be made available to you upon your request to assist you in preparation for the hearing." On May 5, 1975 Newton wrote Wade that he found "the reasons for the cancellation of my indefinite contract ... too vague to enable me to prepare a defense." Newton asked Wade for "a bill of particulars stating the exact incident, behavior or action which led to each of the three charges." Wade did not reply.

Newton's hearing was held May 19, 1975. The members of the School Board present were Richard A. Early, Joseph W. Cooper, Darle V. Dawes, Claude A. Brane and C. Robert Elrod. Wade attended with his assistant superintendent, Edward Kasamis. Newton was represented by Jules Walker and by Karen Wallace, an employee of the Indiana State Teachers Association. Charles Tiede, counsel for the school corporation, presided. Kasamis "prosecuted" and Wallace presented Newton's case.

Four witnesses testified in favor of Newton's termination: Don Hammel, Newton's former principal, George Price, Newton's principal in 1975, and two parents, Patricia Rigsbee and Dixie Mercer. Hammel was

Newton's principal and supervisor from 1964 to 1967. Hammel recounted an incident in which Newton had called upon him to administer corporal punishment to several students. The parents of the students had complained about the punishment. Hammel also testified that on one occasion, in 1967, Newton was away from his duty station without permission. Yet it was Hammel who, in 1968, recommended Newton for tenure.

Hammel was followed by George Price, who was Newton's principal for the 1974–1975 academic year. Price described four areas in which he considered Newton's performance to have been deficient. The first area involved student reports: Price explained that the school system had begun a nine-weeks grading schedule the previous fall. At the end of each nine-week period parent conferences were to be arranged to discuss the children's progress. Teachers were instructed to send an "interim checklist report" home with their students five weeks into the grading period. The reports were to alert parents to problems which might require a conference. The reports were to go out on October 3 and again on February 19. Newton's reports did not go out until October 8 and February 21. Price spoke to Newton on each occasion, but received no explanation for the delay.

Price also testified that Newton was late in arriving for work. Price said that Newton was late on seventeen occasions during the 1974–1975 academic year. Newton testified that the school had inaugurated a new check-in system, the "red card" system, and his apparent tardiness was a function of his occasionally forgetting to hang up the red card indicating arrival. Price admitted that Newton had never been late for the beginning of classes. Price's third area of concern was Newton's administering corporal punishment. On November 5, 1974 Newton paddled three of his students. Another teacher observed the paddling. There was a long-standing School Board policy that corporal punishment could be inflicted "only when adult witnesses are present." Newton considered his colleague

to be such a witness. Price did not. Upon his arrival at La Fontaine three years earlier he had announced that "we.[have] a rule ... that ... you have a witness and in this particular building I'm the witness." Price considered Newton's disregard of his preference an act of insubordination.

Newton's final defect, as described by Price, was in the classroom. According to Price, he began receiving complaints about Newton's classroom performance in October of 1974. Eventually he was confronted with fourteen complaining parents from "about nine different families." The complaints centered around similar issues: Newton was described as unapproachable, either by students or parents. Some parents complained that he alluded to their children as being "dumb" or "stupid" in class. There were complaints that Newton had "poked" or "pounded" students' heads with his pencil. Parents alleged that he refused to allow them to see their children's records. Finally, Price testified that parents complained that Newton's instruction was incomprehensible, so that students were unclear as to what was required of them. Price also indicated that the majority of the complaints about Newton came early in the fall term, before Newton's first series of parent conferences. Price admitted that the complaints could have been a function of Newton's teaching philosophy. In his testimony, Newton described himself as teaching an "individualized" curriculum, encouraging each child to work at his or her own level. Newton said Price had approved his approach. Price agreed that Newton's was an individualized curriculum rather different from that of the other teachers at the school. However, Price did not feel that Newton's curriculum was "that much different from" that of his colleagues. Nor did Price consider Newton's curriculum the sole source of parental complaints.

Patricia Rigsbee and Dixie Mercer, mothers of children who had been in Newton's class, testified and essentially confirmed Price's allegations regarding Newton. Seventeen other parents of children in

Newton's class testified on his behalf. Newton testified, among other things, that he had no idea Price was dissatisfied with his work until he received Wade's letter telling him that he was to be dismissed. Newton considered that he "got along with [Price] very well." Newton was not aware of the number of parental complaints about his teaching. Nor was he aware that Price had discussed his work with Wade. Newton denied that he had ever characterized his students, or their work, as "dumb."

In addition to presenting testimony, both sides introduced a number of exhibits. The exhibits included the earlier described correspondence between Newton and Wade, as well as Price's notes on Newton's performance through the year. Newton's evaluations as a teacher were also included.

At the end of the hearing the School Board resolved to announce its determination on May 27, 1975. At that meeting Joseph W. Cooper moved to accept the staff recommendation and to cancel Newton's continuing contract. After Cooper's motion was seconded Jules Walker spoke on Newton's behalf. Walker presented a petition in favor of Newton's retention.

The Board took the petition under advisement. Other parents spoke on Newton's behalf. After all those desiring to be heard had concluded, the Board voted. C. Robert Elrod was not present. The other four members of the School Board voted to cancel Newton's contract with the school corporation.

On November 12, 1975 Newton filed a complaint in the Wabash Circuit Court seeking reinstatement. The cause was later transferred to the Kosciusko Superior Court, with The Honorable Marvin McLaughlin presiding as special judge. The parties filed pre-trial briefs, and trial was held on July 11, 1977. The transcript of the School Board's hearing was admitted into evidence. There was additional testimony by Newton, Wallace, Wade, Kasamis and three members of the School Board, Dawes, Cooper and Brane. The court took the matter under advisement. On March 8, 1978 the court entered judgment for the School Board. Judge McLaughlin's brief entry included the observations that "procedurally, the Board has more than complied with the statute.[1] The plaintiff, New-

---

1. The statute referred to is IC 20–6–12–2. IC 20–6–12–2 established the procedure required for cancelling an indefinite contract with a teacher:

"Any indefinite contract with a permanent teacher as defined in section 1 [20–6–12–1] of this act may be canceled only in the following manner: Not less than thirty [30] days nor more than forty [40] days before the consideration by any such school corporation of the cancellation of any such contract, such teacher shall be notified in writing of the exact date, time when and place where such consideration is to take place; and such teacher shall be furnished a written statement of the reasons for such consideration within five [5] days after any written request for such statement; and such teacher shall, upon written request for a hearing, filed within fifteen [15] days after the receipt by said teacher of notice of date, time and place of such consideration, be given such a hearing before the school board of such school corporation; such hearing shall be held not less than five [5] days after such request is filed and such teacher shall be given not less than five [5] days' notice of the time and place of such hearing. Such teacher, at the hearing shall have a right to a full statement of the reasons for the proposed cancellation of such contract, and

shall have a right to be heard, to present the testimony of witnesses and other evidence bearing upon the reasons for the proposed cancellation of such contract. No such contract shall be canceled until the date set for consideration of the cancellation of such contract; nor until after a hearing is held, if such hearing is requested by said teacher; nor until, in the case of teachers, supervisors, and principals, the city or town superintendent shall have given the school corporation his recommendations thereon, and it shall be the duty of such superintendent to present such recommendations upon five [5] days' written notice to him by such school corporation. Nothing contained in this section shall prevent the suspension from duty of any teacher pending a decision on the cancellation of such teacher's contract. Cancellation of an indefinite contract of a permanent teacher may be made for incompetency, insubordination (which shall be deemed to mean a wilful refusal to obey the school laws of this state or reasonable rules prescribed for the government of the public schools of such corporation), neglect of duty, immorality, justifiable decrease in the number of teaching positions or other good and just cause, but may not be made for political or personal reasons; Pro-

ton, knew all of the Board's evidence before the date of the Board hearing."

Newton appealed. On May 14, 1980 we reversed the trial court's decision. *State ex rel. Newton v. Board of School Trustees of the Metropolitan School District of Wabash Co.* (1980), Ind.App., 404 N.E.2d 47. We based our reversal upon a single issue, the inadequacy of the findings made by the School Board:

"The only finding made ... was that the reasons given by the staff recommending cancellation of the contract had been proven."

On September 5, 1980 Judge McLaughlin set aside the March 8, 1978 judgment. Judge McLaughlin also ordered the School Board "to make adequate findings of fact or to grant Earl Newton, Jr. a new hearing." The case was "remanded to the said school board." At Newton's request a new judge, The Honorable Douglas Morton, was selected to assume jurisdiction of the cause. Judge Morton issued an order on December 11, 1980 directing the School Board "to submit ... supplemental findings ... on or before the 20th day of January, 1981."

The Board entered findings of fact on January 13, 1981, and filed them with the trial court on January 19, 1981. None of the members of the 1975 School Board were members of the 1981 Board. The 1981 School Board based its findings upon a review of the transcript of the 1975 hearing on Newton's dismissal. The findings centered about Newton's tardiness in sending home the interim progress reports, his employing corporal punishment in Price's absence, and his ineffectiveness in the classroom. Newton filed a motion to strike the proposed findings. The trial court granted Newton's motion to strike on July 29, 1982 and ordered the School Board to "resubmit findings of fact within 60 days of this date." The court included the following brief memorandum with its order:

"As the Court indicated orally at the conclusion of the May hearing, the Court believes that the purported findings of fact dated the 13th day of July, [sic] 1981 did not comply with the findings which the Court of Appeals has determined are necessary. This Court believes that compliance can be made either by (a) members of the former Board (i.e. the Board of May 27, 1975) indicating its fact-finding and conclusions based upon the eight hour hearing or (b) the present Board making a *de novo* determination of the facts either with or without a supplemental hearing."

After obtaining an extension of time in which to comply with the court's order, the 1981 Board "voted to reconvene the previous Board, to refer to them the transcript of the proceedings ... [to] meet and make findings of fact and conclusions of law based upon the evidence." At its regular meeting on September 8, 1981 the 1981 School Board reconstituted the 1975 Board and assigned them the task of entering adequate findings in support of Newton's dismissal. Newton, by counsel, requested a new hearing and indicated "he believed that ... findings of fact and conclusions by the 1975 Board would be a nullity." All five members of the 1975 Board, Brane, Cooper, Dawes, Early and Elrod, were present. They all "agreed they were willing to assume the responsibility for making findings of fact and conclusions thereon."

vided, That when the cause of cancellation of an indefinite contract is immorality or insubordination, as defined in this act [20-6-12-1— 20-6-12-6], such cancellation shall go into effect at once; and, Provided further, That when the cause of cancellation of an indefinite contract is not immorality or insubordination, as defined in this act, such cancellation shall go into effect at the end of the school term following such cancellation. The school board of any such school corporation, by a majority vote, evidenced by a signed statement in the minutes of the board, may cancel an indefinite contract with a teacher after compliance with the provisions of this section; Provided, That the decision of the school board shall be final."

"Indefinite contracts" were provided for tenure teachers under IC 20-6-12-1. Both IC 20-6-12-1 and IC 20-6-12-2 were repealed by Acts 1976, P.L. 100 Section 4. The current provisions on indefinite contracts are found at IC 20-6.1-4-9. IC 20-6.1-4-10 now prescribes the grounds for cancelling indefinite contracts, and IC 20-6.1-4-11 provides the procedures for cancelling indefinite contracts.

In regard to Newton's request for a new hearing, the 1981 Board "expressed the view that it had not been suggested that any available evidence ... not presented at the 1975 hearing ... could be presented" at a new hearing. The 1981 Board also expressed satisfaction that "the 1975 Board had as good recollection of the evidence as would the witnesses who would be called upon to repeat their testimony." The members of the 1975 Board then agreed to review the transcript of the 1975 hearing and to meet with the 1981 Board to report their findings.

After both Newton and the school corporation had submitted proposed findings and conclusions, the 1981 Board met to hear arguments on the merits of each. This took place on October 13, 1981. On October 19 the 1975 Board met and adopted findings of fact and conclusions of law which it then submitted to the 1981 Board. At its regular meeting on October 27, 1981 the 1981 Board unanimously adopted the findings of the reconstituted 1975 School Board.[2] Newton again objected to the procedure. On November 12, 1981 the findings and conclusions were filed with the

2. The findings of fact again centered around Newton's tardiness in sending out the interim progress reports, administering corporal punishment in Price's absence and ineffectualness in the classroom. The findings also included the observation that "from September 16, 1974 through January 7, 1975 Newton was late to school on seventeen days, which number does not include occasions when Newton failed to use the check-in system." The following conclusions of law were entered:

"1. Newton is a permanent teacher of the School District, and the Board has jurisdiction to consider cancellation and to cancel Newton's indefinite contract under I.C. 20-6-12-1 and I.C. 20-6-12-2.

2. Conduct which undermines public confidence in the normal education process by refusal to follow established procedures is within the meaning of the phrase "other good and just cause" as used in I.C. 20-6-12-2.

3. Newton's tardiness in reporting to school for duty on seventeen occasions in the period from September 16, 1974 through January 7, 1975, contrary to requirements of the contract, and without offering excuse therefor, is neglect of duty, insubordination and an undermining of public confidence in the normal education process by refusing to follow established procedures under I.C. 20-6-12-2.

4. That on November 5, 1974, when he paddled three students at LaFontaine School, Newton did not have an adult witness as required by rule of the School District. That the rule of the School District requiring the adult witness during the infliction of corporal punishment, and that corporal punishment be inflicted only by the teacher or principal, is reasonable. That Newton had knowledge of the rule concerning infliction of corporal punishment and had observed the rule prior to November 5, 1974. That Newton's conduct in failing to comply with the corporal punishment rule is insubordination, neglect of duty and an undermining of public confidence in the normal education process by refusing to follow established procedures within the meaning of I.C. 20-6-12-2.

5. That on November 5, 1974, when he paddled three students at LaFontaine School, Newton made no effort to comply and failed to comply with his principal's directive that, at LaFontaine School, spankings be witnessed by the principal, which was a reasonable requirement. Newton had been informed of and knew the rule, and his conduct in disregarding the rule is insubordination, neglect of duty and undermines public confidence in the normal education process by refusing to follow established procedures under I.C. 20-6-12-2.

6. Newton's testimony that "(a) he did not recall the faculty meeting in which Price discussed corporal punishment and required that he, as Principal, witness spanking as a corporal punishment in LaFontaine School; (b) he did not recall receiving a copy of Staff Exhibit 13; (c) he 'thought' he had a teacher witness to the paddlings he administered November 5, 1974, because he thought 'she was standing back there' (Record, p. 372); and (d) that this teacher was in the hall at the same time this was taking place ...." (Record, p. 393), did not establish that Newton was not informed and knowledgeable of the rules, nor that he attempted to comply with the rule covering corporal punishment.

7. That Newton's failure to timely distribute interim progress reports to students on Thursday, October 3, 1974, and February 19, 1975, the dates established by the principal and announced to school patrons, and observed by all other teachers, without offering any excuse, is neglect of duty and an undermining of public confidence in the normal education process by refusing to follow established procedures within the meaning of I.C. 20-6-12-2.

8. Newton's failure to accept and to make reasonable efforts to implement recommendations of his principal for improvement of student-parent and teacher relationships, brought about by numerous parent complaints, is neglect of duty and an undermining of public confidence in the normal education

trial court. On December 15, 1981 Newton filed a motion to strike the submitted findings and conclusions. On May 13, 1982 the court denied Newton's motion to strike and accepted "the tendered findings of fact as being responsive to the Court of Appeals; [sic] directive of May 14, 1980." The trial court also denied Newton's request for alternative relief because "the Court believes that defendant's action in cancelling plaintiff's contract as a tenured teacher was undertaken with appropriate due process and was supported by substantial evidence of the conduct administrators had charged to be 'insubordination, neglect of duty, and undermining the public confidence in the normal education process.'"

Newton appeals, raising the following issues:

1. Was it an illegal act for the 1981 School Board to reconstitute the 1975 School Board and to assign to the latter the task of making adequate findings of fact?

2. Was the statement of reasons for dismissal given to Newton prior to his 1975 hearing so egregiously inadequate as to represent a denial of due process?

3. Was the decision to dismiss Newton supported by substantial evidence?

4. Are the Board's conclusions of law based upon ultimate facts demonstrably inferable from the findings of basic facts?

### I.

Newton's first argument addresses the "unprecedented and improper administrative procedure adopted by the School Board herein." The procedure to which Newton refers is the 1981 Board's reviving the 1975 Board and directing the latter to enter adequate findings of fact pursuant to the Court of Appeals' directive in *State ex rel. Newton v. Board of School Trustees of the Metropolitan School District of Wabash County* (1980), Ind.App., 404 N.E.2d 47.

process by refusing to follow established procedures within the meaning of I.C. 20–6–12–2.
    9. That the indefinite contract of Newton with the School District should be, and the same is hereby, cancelled, as recommended by Supt. Wade, effective May 29, 1975."

His challenge is based upon two alternative premises: (a) The 1981 Board's resuscitation of the 1975 Board was an illegal, ultra vires act so that any findings entered by the latter are "a nullity." (b) Because the 1975 Board was not an impartial fact-finder, Newton was denied his due process right to a "fair hearing ... before an impartial body."

We originally remanded for the entry of findings which would specify what "conduct [the Board] deemed to constitute 'insubordination, neglect of duty and undermining the public confidence in the normal education process.'" 404 N.E.2d at 49. When the members of the 1975 School Board met to hear the charges against Newton they were acting as an administrative body. *Doran v. Board of Education of Western Boone County Community Schools* (1972), 152 Ind.App. 250, 283 N.E.2d 385, 387, *reh. den.* 152 Ind.App. 250, 285 N.E.2d 825. School boards are agencies "of less than state-wide jurisdiction" and, as such, are not governed by the provisions of the Administrative Adjudication Act, IC 4–22–1–1 et seq. *South Bend Community School Corp. v. National Education Association—South Bend* (1983), Ind.App., 444 N.E.2d 348, 350; 285 N.E.2d at 828. The Act's requirement of findings of fact in all administrative determinations does not, therefore, apply to school boards. IC 4–22–1–10; 404 N.E.2d at 48, citing *Tippecanoe Valley School Corp. v. Leachmen* (1970), 147 Ind.App. 443, 261 N.E.2d 880. Nor does IC 20–6–12–2 require that cancellation of a teacher's indefinite contract include entry of specific, written findings. 404 N.E.2d at 48; n. 1, *supra.* However, it is the duty of an administrative body "to make a finding of the pertinent facts on which its decision is based in order to facilitate judicial review whether or not such findings are specifically required by stat-

The findings and conclusions were signed by the five members of the reconstituted 1975 Board.

ute." 404 N.E.2d at 48–49; *Yunker v. Porter County Sheriff's Merit Board* (1978), 178 Ind.App. 364, 382 N.E.2d 977, 982.

■ Entry of written findings "is essential to preserve the limited scope of a reviewing court's inquiry. The absence of findings invites a reweighing of the evidence on review, thereby paving the way for judicial intrusion into matters committed to administrative discretion by the Legislature." 382 N.E.2d at 982. Although the courts do "exercise a certain review power" over the administrative process, they "do not intrude into the area of valid administrative discretion." *Uhlir v. Ritz* (1970), 255 Ind. 342, 264 N.E.2d 312, 313. Administrative agencies are created by the legislature to exercise discretion in two general areas, rule-making and adjudication. 264 N.E.2d at 313; 2 Am.Jur.2d *Administrative Law* Section 316; K. Davis, 2 *Administrative Law Treatise* Section 7:2 and Section 7:3 (2d ed. 1979). "Adjudication" is the resolution of a particular issue, typically involving a controversy between two parties. Davis, 2 *Administrative Law Treatise* at Section 7:3, p. 12; IC 4–22–1–2; 1 Am.Jur.2d *Administrative Law* Section 159. In exercising its adjudicative function an administrative agency is acting in a judicial capacity. 1 Am.Jur.2d *Administrative Law* Sections 158–61; *Hannah v. Larche* (1960), 363 U.S. 420, 442–44, 80 S.Ct. 1502, 1514–15, 4 L.Ed.2d 1307. In that capacity the agency serves as the trier of fact for "adjudicative facts." Davis, 2 *Administrative Law Treatise* Sections 12:1—12:3; 1 Am.Jur.2d *Administrative Law* Section 159. Adjudicative facts are "the kind of facts that go to a jury in a jury case." Davis, 2 *Administrative Law Treatise* at Section 12:3, p. 413.

In determining Earl Newton's future with the Metropolitan School District of Wabash County the 1975 School Board was an administrative entity engaged in an adjudicatory process. One facet of that process was, of course, fact-finding. We found that facet deficient. 404 N.E.2d at 48–49. The issue before us now is whether it was erroneous to remedy that deficiency by resuscitating the original trier of fact. Because this is not an issue which has been addressed by the case law, we must resolve it by relying upon analogies to other triers of fact and by considering the purpose of requiring particular findings.

■ A school board acting as the trier of fact in an administrative hearing is analogous to a trial court judge who acts as the trier of fact in a judicial proceeding. Indiana Rules of Procedure, Trial Rule 63(A) provides that "[t]he judge who presides at ... a hearing at which evidence is received shall, if available, hear motions and *make all decisions and rulings required ... relating to the evidence* and the conduct of the ... hearing." (Emphasis added.) The premise underlying Trial Rule 63(A), formerly Supreme Court Rules 1–8 and 1–9, is that the judge who has presided at a trial and who has observed the presentation of the evidence is "the best person" to make decisions concerning the sufficiency of the evidence and the adequacy of the procedure. *State v. Smith* (1973), 260 Ind. 555, 297 N.E.2d 809, 812; *State ex rel. Hodshire v. Bingham, Judge* (1941), 218 Ind. 490, 493–94, 33 N.E.2d 771. In *State v. Smith* our Supreme Court held that the judge who had presided at all the hearings on a controversy was the proper person to rule on a motion to set aside a summary judgment *despite the fact* that he had since ceased to be a judicial officer and had become a private attorney. 297 N.E.2d at 811–12. The court found that departure from the judiciary did not render the former judge "unavailable" under Trial Rule 63(A). *Id.* 297 N.E.2d at 812. *See also Bailey v. Sullivan* (1982), Ind.App., 432 N.E.2d 75, 76. "The theory ... is that the trial judge has continuing jurisdiction." 297 N.E.2d at 812.

■ We find the 1975 School Board analogous to the "lame duck" judges in *Smith* and in *Bailey*. The 1975 Board was the judicial trier of fact in Newton's original hearing. All five members of the Board attended the May 19, 1975 hearing, although Elrod was absent when the vote

was taken on Newton's contract at the May 27 meeting. All the members heard the arguments presented and were able to observe the witnesses testifying. One concern underlying Trial Rule 63(A) is that parties are entitled to have issues determined by the judicial entity hearing the evidence and observing the demeanor of the witnesses. *State of Indiana ex rel. Harp v. Vanderburgh Circuit Court* (1949), 227 Ind. 353, 363, 85 N.E.2d 254; *Urbanational Developers, Inc. v. Shamrock Engineering, Inc.* (1978), 175 Ind. App. 416, 372 N.E.2d 742, 746. Here, the 1975 Board was that entity. All its members were still available. At the September 8, 1981 meeting of the successor Board, the members of the 1975 Board indicated that they recalled the evidence presented at the 1975 hearing. We consider the likelihood of that recollection inferentially enhanced by the context. Both the Board members and the witnesses were members of the same school community. It seems reasonable to assume, therefore, that the Board members would retain their impressions of their neighbor's positions on such a controversy. In this respect the Board members are precisely analogous to the former judges held competent to enter rulings after their official capacity had expired. The members of the 1975 Board were "available" and were qualified to enter findings. We agree with the reasoning expressed by the trial court in explaining its denial of Newton's motion to strike the 1975 Board's overdue findings:

"Under the circumstances here, no other course makes sense. The five members of the May, 1975 board are the only persons who can indicate what their reasons were and what evidence they relied upon. For any other group (including subsequent members of the same body) to try to reconstruct reasons is most assuredly improper and inaccurate; that, quite precisely, is the issue the Court of Appeals addressed. The remand was the result. Surely an indication from a quorum or a majority of the Board members of 1975 would have sufficed for their explanation; here however all five participated with three indicating that they had a clear recollection of these matters and a fourth indicating that he also retained notes. In determining that the former board is an appropriate source for fact finding, this Court finds the analogies to *Hodshire v. Bingham* (1941), [218 Ind. 490] 33 N.E.2d 771 and its progeny, most recently *Bailey v. Sullivan* ([Ind.App.] 1982), 432 N.E.2d 75, as both useful and applicable.

Hearing *de novo* does not appear to be desirable. Seven years have gone by so that the twenty witnesses are now scattered and memories and emotions have faded; defendant's 6th grade students of that year would normally have graduated from high school in 1981. School administrators have changed so that personal knowledge would no longer be available for recommendations by the Superintendent; only the records (already in the record as exhibits) could be relied upon to base this most significant consideration. Worst of all, the sitting board members, the 'jury' at the hearing ... could hardly claim lack of prejudice since seven years of back salary would be in dispute. If only for fiscal considerations a conscientious board may find itself searching for a viable means to ratify the earlier action instead of basing its decision upon the appropriate criteria. It appears to be eminently more fair to all concerned to simply ask the actual participants who are (1) available and willing to act in sufficient number, (2) capable of independent recollection, and (3) not in any present position of conflicting interest, why they took the action and upon what facts they based it."

█ We find, too, that the resuscitation of the 1975 Board was an appropriate solution for the problem presented. That is, we remanded the cause with instructions to "make adequate findings of fact or in the alternative grant appellant a new hearing." 404 N.E.2d at 49. The 1981 Board elected the former. The failure to enter sufficient findings of fact is a technical defect which may be corrected without threatening the

merits of the adjudication. 382 N.E.2d at 982–83; *Department of Financial Institutions v. State Bank of Lizton* (1969), 253 Ind. 172, 252 N.E.2d 248, 252. We consider the 1981 Board's reconstituting the 1975 Board an appropriate means for correcting such a defect. It possessed the essential virtue of insuring that the findings were entered by those in the best position "to observe the demeanor of witnesses and thereby evaluate their credibility." *Addison v. Review Board of Indiana Employment Security Division* (1979), Ind.App., 397 N.E.2d 1037, 1039. Because the task assigned to the 1975 Board was a "mere ministerial" one, 227 Ind. at 360, 85 N.E.2d 254, not implicating the judgment entered so many years ago, there was no error in recreating the 1975 Board for this limited purpose. Nor are the findings entered by this Board "a nullity," as Newton suggests.

■ We also reject Newton's contention that he was denied due process by the 1981 Board's reliance upon a resuscitated fact-finder. While due process is required in adjudicatory administrative proceedings, such proceedings "are not required to be conducted with all of the procedural safeguards afforded by judicial proceedings .... We accept a lower standard in proceedings before [administrative] bodies because it would be unworkable to do otherwise." *City of Mishawaka v. Stewart* (1974), 261 Ind. 670, 310 N.E.2d 65, 68. Although the solution adopted here is certainly a singular one, singularity does not, alone, deny due process. Indeed, this is a perfect instance of reconciling "workability" and due process. Findings were entered by those most intimately acquainted with the 1975 proceedings leading to Newton's dismissal. Although this body was not a fact-finder of perfect naiveté, Newton's assertion that their experience with his cause denied him due process is ill-taken. If nothing else, there is the fact that the judicial decision to dismiss had already been made. These supplemental proceedings were, as discussed immediately above, remedial measures directed at a purely technical defect. They did not affect the nature of the hearing that preceded them by six years. Due process was not denied.

## II.

Newton's next argument is that the statement of reasons for dismissal given him "prior to and at ... the hearing ... was not sufficiently specific or detailed to meet the requirements of IC 20–6–12–2" or of due process. After Newton received notice of his impending dismissal he requested a statement of the reasons for the contemplated action. He indicated in his request that he desired a statement of sufficient specificity to permit preparation of a rebuttal. The only response was Lawrence Wade's May 2, 1975 letter:

"Dear Mr. Newton:

In response to your letter request dated April 26, 1975, received in our office April 28, 1975, the following reasons are given for the Board consideration of the staff recommendation for cancellation of your indefinite contract:

Insubordination

Neglect of duty

Undermining public confidence in the normal education process by refusing to follow established procedures.

You are also advised the Board of Education will hold a hearing pursuant to the provisions of Burns' Indiana Statutes Section 28–4512 at 7:30 o'clock P.M. (EST) on May 13, 1975.

Copies of any item in your file will be made available to you upon your request to assist you in preparation for the hearing.

Yours very truly,
THE METROPOLITAN SCHOOL
DISTRICT OF WABASH COUNTY,
INDIANA
Lawrence Wade,
Superintendent"

Newton argues this was insufficient: "Two of the three reasons ...—insubordination and neglect of duty—are merely boilerplate recitation of the statutory causes set out in the Act. The third reason

given—undermining public confidence by refusing to follow established procedures—is equally conclusory .... None of these ... reasons ... fully apprised [Newton] of the claim against him."

The act to which Newton refers is IC 20–6–12–2. The statute provides that a teacher "*at the hearing* shall have a right to a full statement of the reasons for the proposed cancellation" of his indefinite contract.[3] (Emphasis added.) The statute further provides that "[c]ancellation of an indefinite contract ... may be made for incompetency, insubordination (which shall be deemed to mean a wilful refusal to obey the school laws of this state or reasonable rules prescribed for the government of the public schools of such corporation), neglect of duty ... or other good and, just cause." IC 20–6–12–2.

The School Board "admits that the reasons stated ... in the letter ... of May 2, 1975 were conclusionary [sic]." The Board maintains, however, that the conclusory nature of the reasons given in the letter did not deny Newton his right to due process. They base their contention upon two points, one factual and one legal. The factual proposition is that, although the statement of reasons may have been inadequate, the inadequacy was cured by Wade's offering Newton copies "of any item" in his file. The Board notes that Newton took advantage of the offer. Prior to his hearing Newton's representative Karen Wallace met with Wade, Kasamis and Price. At that meeting Ms. Wallace reviewed the documents eventually introduced at the hearing. She would later concede that she was given "total access" to "all the people, all the evidence" before the hearing. But Newton maintains this was not enough. He contends the Board was required to specify the correlation between each item of evidence and each of the charges against him, to "detail which ... incidents fit under which category."

The Board counters with a legal proposition: "[Newton] was entitled to know the nature of the accusation so that he might intelligently prepare to meet it. However, in the absence of specific statute or other formal statement ... no ... specific content is required. It is sufficient if the party is fairly apprised of the claim against him." *Gary Teachers Union v. School City of Gary* (1975), 165 Ind.App. 314, 332 N.E.2d 256, 261. The Board maintains that Newton was "fairly apprised of the claim against him" and that no statute required more. We agree.

■ IC 20–6–12–2 provides that a tenured teacher shall be provided with (a) "a written statement of the reasons" for contract cancellation within five days of a request for such a statement, and (b) "a *full* statement of the reasons for the proposed cancellation" at his hearing. (Emphasis added.) The statutory language supports the Board's contention that the pre-hearing statement need only put the teacher on notice of the charges against him. The purpose of the pre-hearing statement is, as we indicated in *Gary Teachers Union, supra*, to permit the teacher to prepare an intelligent response to the charges. A general statement may suffice for this purpose. A precise, detailed statement of the sort Newton describes was not required until the hearing on the merits.

■ Because IC 20–6–12–2 did not contain a requirement of heightened specificity, the statement of reasons given Newton was governed by the "fair appraisal" standard. 332 N.E.2d at 261. It satisfied the requirement. Newton was given three reasons for the contemplated dismissal. Two of the reasons, insubordination and neglect of duty, are specified in the statute. Insubordination is clearly defined in the statute,[4] and "neglect of duty" is hardly so recondite as to be incomprehensible to one of Newton's educational attainments. The third reason, "undermining public confidence in the normal education process by refusing to follow established procedures,"

---

3. For the full text of IC 20–6–12–2 *see* n. 1, *supra*.

4. *See* n. 1, *supra*.

is not specifically provided for in the statute, but would be encompassed by the statute's proviso for "other good and just cause." While this reason may be rather redundant, given the first two, it is not so incomprehensible as to deny Newton a fair opportunity for rebuttal. Our review of the record of the 1975 hearing convinces us that Newton was sufficiently aware of the charges to prepare a rebuttal. The Board heard the testimony of Price, Hammel and two parents in support of dismissal. Newton presented his own testimony plus that of seventeen parents. The testimony presented by Newton contested the assertions made by the school corporation. We note that Newton does not contend there was additional evidence which he could have presented but did not because the reasons given were so amorphous that he did not realize what was necessary for rebuttal. Our review of the record and of the applicable law convinces us there was no denial of due process.

### III.

Newton's third argument is that the decision of dismissal was not supported by substantial evidence. It is true our "scope of review" of an administrative determination includes "a consideration of whether or not there is ... substantial evidence to support the finding and order of the administrative body." *Department of Financial Institutions v. State Bank of Lizton* (1969), 253 Ind. 172, 252 N.E.2d 248, 250.

We find the Board's decision was supported by substantial evidence. We agree with the trial court's observation on this issue in denying Newton's motion to strike:

"Finally, the Court believes that the evidence supports the specific findings and that the findings are sufficient for dismissal. Evidence of plaintiff's failure to send home evaluation sheets timely on two separate occasions when parents had been told they would be produced, his failure to abide by procedures for witnessing of corporal punishment, his tardi-

ness, and his failure to conform to suggested improvements all was presented. Although the evidence of tardiness was frankly marginal, evidence of all were sufficient to raise the cancellation issue to the Board's sound discretion. In addition, Newton's completion of self-evaluation questionnaires by rating himself 'superior' in all areas calls into question either the sincerity with which he approached self-evaluation or his willingness to consider either constructive criticism or modification of his current techniques. Finally, parents of his students had taken the unusual step of requesting a group meeting with the building principal to voice grievances concerning their children's school experiences as well as their own frustration with parent-teacher conferences. It is clear from this record that all was not well in the 6th grade at La Fontaine. The Court believes that the evidence was sufficient for the Board to make the tendered findings and that the findings support its actions."

### IV.

Newton's final argument challenges the adequacy of the findings of fact. Specifically, he argues that the findings are not based upon ultimate facts demonstrably inferable from basic facts.

The "proper procedure" which an administrative body should follow in reaching a decision is described in *Capital Improvements Board v. The Public Service Commission* (1978), 176 Ind.App. 240, 375 N.E.2d 616:

"The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion."

375 N.E.2d at 630–31, quoting *Saginaw Broadcasting Company v. FCC* (1938), 68

App.D.C. 282, 96 F.2d 554, *cert. denied* 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391. An "ultimate fact is usually expressed in the language of a statutory standard." K. Davis, *Administrative Law Text* Section 16.-04 (1971); *see also* 375 N.E.2d at 631. In the present case the ultimate facts are the three charges against Newton, insubordination, neglect of duty and undermining public confidence in the normal education process by refusing to follow established procedures. "Basic facts" are "those on which the ultimate finding rests; ... basic [facts] are more detailed than ... ultimate [facts] but less detailed than a summary of the evidence." Davis, *Administrative Law Text* at Section 16.04.

When entering findings, an administrative agency must indicate the "rational relationship" between basic and ultimate facts which led to its conclusion. *V.I.P. Limousine Service, Inc. v. Herider-Sinders, Inc.* (1976), 171 Ind.App. 109, 115–16, 355 N.E.2d 441, 445. *See also Perez v. United States Steel Corporation* (1981), Ind., 426 N.E.2d 29, 33. "The findings must be specific enough to provide the reader with an understanding of the Board's reasons, based on the evidence, for its finding of *ultimate* fact." 426 N.E.2d at 33. We hold that the findings entered by the reconstituted School Board on October 19, 1981 and later adopted by the 1981 Board are adequate to meet this requirement.

The resuscitated Board adopted twenty-four particularized findings of fact on October 19, six of which were taken from proposed findings submitted under protest by Newton. From these rather lengthy findings the Board entered nine conclusions of law.[5] Conclusions 3, 4, 5, 6, 7 and 8 clearly indicate the "rational relationship" between the particular facts found earlier and the ultimate facts at issue. Conclusion 7, for example, clearly indicates the rational relationship between Newton's failure to distribute the interim reports and two of the ultimate facts in issue:

> "That Newton's failure to timely distribute interim progress reports to stu-

dents on Thursday, October 3, 1974, and February 19, 1975, the dates established by the principal and announced to school patrons, and observed by all other teachers, without offering any excuse, is neglect of duty and an undermining of public confidence in the normal education process by refusing to follow established procedures within the meaning of IC 20–6–12–2."

We consider the findings of fact and conclusions therefrom adequate to meet the requirements enunciated by the courts in this state. 426 N.E.2d at 31, and cases cited therein. Unlike the original findings, these are sufficient to indicate "the conduct ... deemed to constitute 'insubordination, neglect of duty and undermining the public confidence in the normal education process.'" 404 N.E.2d at 49.

The decision is affirmed.

STATON and CONOVER (sitting by designation), P.JJ., concur.

---

5. For the full text of these conclusions *see* n. 2, *supra.*